UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CARLOS A. ESPINOZA,

Petitioner,

v.

W. L. MONTGOMERY, Warden,

Respondent.

Case No. 17-cv-02159-YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY**

Petitioner Carlos A. Espinoza, a state prisoner, brings the instant *pro se* habeas action under 28 U.S.C. § 2254 to challenge his 2012 conviction and sentence. A Monterey County jury convicted Petitioner, who was 17 years old at the time he committed the offenses, of first degree murder, attempted premeditated and deliberate murder, and active participation in a criminal street gang. The jury also found that Petitioner committed the murder and attempted murder for the benefit of a criminal street gang, and that in committing the murder and attempted murder, he personally used and intentionally discharged a firearm and proximately caused great bodily injury or death. The petition raises the following three claims: (1) the gang crime and gang enhancements must be reversed because the gang expert's opinion testimony was based in part on testimonial hearsay, in violation of Petitioner's Sixth Amendment right to confrontation; (2) an ineffective assistance of counsel ("IAC") claim based on his trial counsel's failure to object to the gang expert's opinion testimony on confrontation grounds; and (3) the judgment must be reversed due to jury misconduct because one juror visited the scene and told the other jurors what he observed. Dkt. 1 at 7-27.[1]

Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the petition for the reasons set forth below.

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

# I.   BACKGROUND

## A.   Factual Background

The California Court of Appeal summarized the facts of Petitioner's offense as follows. This summary is presumed correct.  *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

### *A. The Shooting*

On August 6, 2009, Jose Perez was outside of his house on Terrace Street in Salinas.  Perez was wearing a white t-shirt, shorts, and sneakers.  He was talking to his friend Poncho, who was loaning Perez a bicycle.  Perez was planning to ride the bicycle to football practice.  According to his brother, Perez was not involved with gangs.  Rather, he was "100 percent involved in sports," particularly football.

While Perez and Poncho stood outside, two cars turned onto Terrace Street: a gray primered Mitsubishi Galant, and a grayish-green primered Lexus.  The cars stopped in front of the house.  Defendant got out of the Galant, cocked a gun, and began shooting.  Poncho started running.  He looked back and saw Perez on the ground.  He ran to a fence, then looked back again.  Defendant shot at him, then shot Perez while standing over him.

Perez was later transported to the hospital, where he was declared deceased.  Perez had multiple gunshot wounds, including some that had been fired at close range.

### *B. Prior Incidents Between Poncho and Defendant*

Poncho knew defendant as "Flaco."  He knew defendant from school.  At school, defendant often engaged in "mugging" (staring at) him, and defendant would sometimes bump into him.  Defendant had chased Poncho on two prior occasions.  First, about three months before the shooting, defendant was in a car that tried to run Poncho over.  Then, about one and a half months before the shooting, defendant chased Poncho while driving.

Poncho knew that defendant hung out with Sureños and that defendant considered Poncho to be associated with Norteños.  Poncho denied he was in fact a gang member but admitted he had a close family member who was in a Norteño gang.  Poncho also admitted he had a tattoo of the word "Salas" on his back and that he previously had the roman numerals XIV on his hand.

### *C. Coparticipant Testimony*

Julio Montoya Luna (Montoya), Juan Nunez, and Antonio Gayoso were coparticipants in the shooting of Perez.  Montoya and Gayoso were members of the Mexican Pride Locos, a Sureño gang.  Nunez and defendant were associated with the Vagos, a [sic] another Sureño gang.

Montoya and Nunez both entered into agreements with the prosecution, pursuant to which each pleaded guilty to being an accomplice and a gang member in exchange for testifying against defendant.

Montoya and Nunez both testified about defendant's tattoos, which included the number 22 and the phrase "'One Way.'" To get a tattoo of the number 22, which represents "V," the 22nd letter of the alphabet, a Vagos gang member must do a shooting. "'One Way'" refers to a street in the Vagos territory.

Montoya and Nunez also testified about the Perez shooting. Earlier that day, a Sureño gang member named "Shaggy" had been shot. Afterwards, Nunez, defendant and other Sureño gang members had a discussion about how to respond. Nunez said he "could be the one" to do a retaliatory shooting; he wanted to "look good." Six of the Sureño gang members went looking for Norteños. They "didn't find anyone," although Nunez and two other Sureño gang members shot at a house where Norteños lived.

Nunez and defendant eventually went to the location of Shaggy's shooting. Gayoso approached Nunez, angry about the shooting. Defendant indicated that he had a gun and asked Gayoso "what did he want to do." Defendant borrowed a sweatshirt and gloves, then asked Nunez to "go with him to go riding," meaning to go find "someone to shoot at." Nunez called Montoya over and said, "'The homies are going to go do some riding. Do you want to go?'" Montoya understood this meant that they were going to look for rival Norteños.

Montoya drove one car with Nunez as his passenger. They followed Gayoso, who was driving another car with defendant as his passenger. At Terrace Street, defendant got out and fired his gun at Perez and Poncho. According to Montoya, defendant shot Perez three or four times, then kicked him, then fired the gun three or four more times. Nunez heard about six shots. He saw defendant shoot at Perez when Perez was on the ground.

Both cars drove away from the scene. Defendant and Nunez subsequently switched cars: Nunez got into Gayoso's car, and defendant got into Montoya's car. Defendant left the sweatshirt he had been wearing in Gayoso's car.

When Montoya and defendant were later arrested and transported to jail, defendant told him, "'Don't worry. They have nothing against us.'" Defendant later instructed Montoya to "'just say that it was someone else. That it wasn't me.'" Defendant told Montoya to invent a nickname and say the person had gone to Mexico.

At the time of the Perez shooting, both defendant and Nunez had no hair. They were about the same size and build.

### D. Gang Expert

Salinas Police Officer Robert Zuniga testified as the prosecution's

gang expert. He had attended the police academy in 2005 and had been working in the gang unit since March of 2008. At the time of trial, Officer Zuniga was working in the gang unit's street enforcement group, and he had previously worked as a gang intelligence officer. As a gang intelligence officer, he contacted gang members on a daily basis, often in informal settings. He had also obtained information about gangs from confidential reliable informants and other gang experts. In preparation for testifying about the various people involved in this case, he had reviewed documentation such as crime reports and field interview cards.

According to Officer Zuniga, Perez had no documented gang contacts. Officer Zuniga believed that Poncho and his brother were both active Norteño gang members, and that Gayoso, Montoya, Nunez, and defendant were all active Sureño gang members at the time of the Perez shooting.

Officer Zuniga explained why he believed defendant was an active Sureño gang member. First, he referred to defendant's tattoos, which included the number 22 and the phrases "'One Way,'" "'Most Wanted,'" and "'Salinas Finest.'" Second, when defendant was arrested, he was in the company of other Sureño gang members, including two Sureño gang members who were hiding in a restroom, where a loaded firearm was found. Third, defendant had made a statement at juvenile hall to the effect that he was "not ready to leave the gang lifestyle." He had previously stated that he had been associating with Sureño gang members since the age of 13. Fourth, defendant had been involved in a number of prior incidents (including a prior incident in which shots were fired at an elementary school), during which he was associating with Sureño gang members or engaging in gang-related activities. Fifth, defendant had been housed with Sureño gang members in jail.

Officer Zuniga testified that the primary activities of the Sureño gang are "a variety of crimes," including homicides, shootings, carjackings, robberies, and burglaries.

The prosecution established that Sureño gang members had engaged in a "pattern of criminal gang activity" (see § 186.22, subds. (a), (e), (f)) by introducing court documents showing criminal convictions for enumerated offenses and eliciting Officer Zuniga's testimony about each crime. The documents and testimony established the following.

First, on January 12, 2009, Valentine Rivas and Benjamin Carrillo challenged some Norteño gang members, then "opened fire[d]," killing one of the Norteño gang members. Rivas and Carrillo were both convicted of homicide. Officer Zuniga testified that he was "familiar with" both defendants and with the incident, and he rendered an opinion that both were active participants in the Sureño criminal street gang.

Second, on August 10, 2008, Isaac Arriaga entered a market, where he brandished a BB gun and asked the clerk for "all of the money." Arriaga was convicted of robbery. Officer Zuniga testified that he was "familiar with" the facts of the case, and he rendered an opinion

that Arriaga was a Sureño gang member at the time.

Third, on February 25, 2007, Hugo Chavez and Hugo Cervantes fired guns at some Norteño gang members. They were found with a loaded firearm in their vehicle and were convicted of attempted murder and malicious shooting from a vehicle. Officer Zuniga testified that he was "familiar with" the facts of the case, and he rendered an opinion that both Chavez and Cervantes were active Sureño gang members at the time of the offenses.

Fourth, on February 11, 2007, Juan Rivas was in a vehicle with another Sureño gang member; a loaded firearm was found under his seat during a traffic stop conducted by another officer. Rivas was convicted of carrying a loaded firearm in his vehicle. Officer Zuniga testified that he was "familiar with" the facts of the case, and he rendered an opinion that Rivas was a gang member at the time of the offense.

Fifth, on May 15, 2006, Adan Flores got into an argument with some Norteño gang members inside of a 7-Eleven, then shot and killed one of the Norteño gang members. He was convicted of homicide. Officer Zuniga testified that he was "familiar with" the facts of the case, and he rendered an opinion that Flores was an active Sureño gang member at the time of the offense.

Given a hypothetical situation based on the facts of this case, Officer Zuniga opined that the crime was committed for the benefit of and in association with the Sureño gang, and that it promoted, furthered, and assisted the commission of criminal conduct by the Sureño gang.

### E. Defense Case

The defense theory was that Nunez, not defendant, shot Perez. This theory was based primarily on testimony from Guadelupe Gastelum, an independent eyewitness.

Gastelum was visiting friends on Terrace Street at the time of the Perez shooting. He was standing in the street, talking to a friend, when he heard and saw a Mitsubishi Galant turn onto the street. He saw a male exit from the car and shoot at Perez. Gastelum estimated that he was about 300 to 320 feet away from the shooter. His location was about three houses down the street. When the shooter moved closer to Perez, Gastelum's vision was blocked by a fence.

According to Gastelum, the shooter wore a black shirt and blue pants. The shooter was bald and was not wearing a hat. The shooter's sweatshirt might have had a hood, but the hood was not on the shooter's head.

Later that evening, Gastelum was brought to an infield show-up, where he viewed Nunez and Gayoso. He identified Nunez as the shooter, recognizing him because he was bald, wore a black shirt, and had the same build and skin color as the shooter. Gastelum identified Gayoso as the driver. The officer accompanying Gastelum to the show-up opined that Gastelum seemed "very sure"

5

of his identifications.

### F. Charges, Trial, and Sentencing

Defendant was charged with first degree murder (§ 187, subd. (a); count 1), attempted premeditated and deliberate murder (§§ 664/187, subd. (a); count 2) and active participation in a criminal street gang (§ 186.22, subd. (a); count 3). The District Attorney alleged that defendant committed the murder and attempted murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(5)), and that he personally used and intentionally discharged a firearm and proximately caused great bodily injury or death (§ 12022.53, subds. (b), (c), (d)).

*People v. Espinoza*, No. H038508, 2016 WL 7105924, *1-5 (Cal. Ct. App. Dec. 6, 2016) (brackets added).

### B. Procedural History

#### 1. Conviction and Sentencing

As mentioned above, in April 2012, a Monterey County jury convicted Petitioner of all three charged offenses. 2 CT 572-78; *Espinoza*, 2016 WL 7105924, *5. The jury also found true all of the special allegations. *Id.* The trial court sentenced Petitioner to an aggregate prison term of 85 years to life. 3 CT 708-709; *Espinoza*, 2016 WL 7105924, *5.

#### 2. Post-Conviction Appeals and Collateral Attacks

The present case came before the California Court of Appeal on two separate instances. In the first instance, Petitioner originally appealed on three claims, including the confrontation clause and juror misconduct claims as well as a sentencing claim, in which he claimed "that remand for resentencing [was] required because the sentence of 85 years to life constitute[d] cruel and unusual punishment in light of the fact he was a juvenile at the time he committed the offense." *Espinoza*, 2016 WL 7105924, *1. The parties petitioned the California Supreme Court for review after the state appellate court arrived at an opinion (issued on January 31, 2014[2]) that would have reversed judgment on Petitioner's sentencing claim and remanded for resentencing.[3] *Id.* The California

---

[2] *See People v. Espinoza*, No. H038508, 2014 WL 347025, *12-16 (Cal. Ct. App. Jan. 31, 2014).

[3] While the first appeal was pending, Petitioner filed a petition for a writ of habeas corpus, which the state appellate court ordered to be considered with the appeal. *Espinoza*, 2016 WL 7105924, *14, note 2. In that petition, he raised his IAC claim based on trial counsel's failure to object to the gang expert's opinion testimony. *Id.* The court summarily denied the state habeas

Supreme Court granted review, but deferred briefing to transfer the case back to the California Court of Appeal in view of recent opinions in *People v. Sanchez*, 63 Cal. 4th 665 (2016) and *People v. Franklin*, 63 Cal. 4th 261 (2016) in relation to his sentencing claim. *Id.*

In the interim, on December 8, 2014, Petitioner filed his first federal habeas petition. *See* Case No. C 14-5376 YGR (PR). The Court dismissed his first petition without prejudice on abstention grounds pursuant to *Younger v. Harris*, 401 U.S. 37 (1971). *See* Dkt. 8 in Case No. 14-5376 YGR (PR).

Thereafter, the present case came before the state appellate court for the second time. On December 6, 2016, after obtaining supplemental briefing from the parties, the state appellate court reviewed the present case. *Espinoza*, 2016 WL 7105924, *1. The court subsequently vacated its prior opinion as to the sentencing claim, and affirmed Petitioner's conviction in an unpublished opinion, "finding that *Sanchez* did not require reversal, but that a limited remand was required pursuant to the *Franklin* decision to give Petitioner the 'opportunity to make a record of information relevant to his eventual youth offender parole hearing.'" *Espinoza*, 2016 WL 7105924, *1, *12-14.

The California Supreme Court denied Petitioner's subsequent petition for review on March 1, 2017. Resp't Exs. 14, 15.

### 3. Federal Court Proceedings

On April 18, 2017, Petitioner filed the instant federal petition, in which he raises the three aforementioned claims. Dkt. 1. On August 1, 2017, the Court issued an Order to Show Cause. Dkt. 7. Respondent has filed an Answer. Dkt. 16. Petitioner has filed a Traverse. Dkt. 20.

## II. LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996,

---

petition by separate order filed on January 31, 2014. *See In re Espinoza*, H040305; *see* Cal. Rules of Court, rule 8.387(b)(2)(B). The California Supreme Court denied Petitioner's petition for review of that order on May 14, 2014. *See In re Espinoza*, S217072.

a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, s*ee Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

### A.    28 U.S.C. § 2254(d)(1)

To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the United States Supreme Court which existed at the time the petitioner's state court conviction became final. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-406. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence

8

presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, the Court reviews the "last reasoned decision" by the state court. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

As explained below, Petitioner did not contemporaneously object to the gang expert's opinion testimony on Sixth Amendment grounds. *Espinoza*, 2016 WL 7105924, *6. However, in its unpublished disposition issued on December 6, 2016, the state appellate court "assume[d] that the confrontation clause argument was not forfeited and address[ed] the merits . . . ." *Id.*; *see also id.*, *6-8. The court also addressed the merits of the juror misconduct claim in the same opinion. *Id.*, *9-12. Therefore, the last reasoned decision as to Petitioner's confrontation clause and juror misconduct claims is the California Court of Appeal's unpublished disposition issued on December 6, 2016. *See Espinoza*, 2016 WL 7105924, *5-12

Meanwhile, no reasoned decision exists on Petitioner's IAC claim, which was summarily denied by the state appellate court on January 31, 2014. *Id.*, *14 at note 2. The California Supreme Court denied the petition for review of that summary denial on May 14, 2014. *Id.* A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay,* 692 F.3d 948, 957 & n.3 (9th Cir. 2012). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011).

"Independent review of the record is not de novo review of the constitutional issue, but

rather, the only method by which [a court] can determine whether a silent state court decision is objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Even where no reasoned decision is available, the habeas petitioner still bears the burden of "showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). The federal court is obligated to review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." *Id.* This Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102.

### B. 28 U.S.C. § 2254(d)(2) and (e)(1)

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where a state court fails to consider and weigh highly probative, relevant evidence, central to a petitioner's claim, that was properly presented and made part of the state court record. *Taylor v. Maddox*, 366 F.3d 992, 1005 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014). A district court must presume correct any determination of a factual issue made by a state court unless a petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The presumption of correctness applies to express and implied findings of fact by both trial and appellate courts. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *see Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004) ("On habeas review, state appellate court findings—including those that interpret unclear or ambiguous trial court ruling—are entitled to the same presumption of correctness that we afford trial court findings.").

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court. *See Taylor*, 366 F.3d at 999-1000. In *Taylor*, the

Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1).  *Id.*  First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2).  *Id.* at 1000.  The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings.  *Id.*  Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by addressing the state court finding of a presumption of correctness under § 2254(e)(1).  *Id.*  According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error.  *See* 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)."  *Taylor*, 366 F.3d at 1000.

If constitutional error is found, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

## III.  DISCUSSION

### A.  Claims Related to Admission of Gang Expert's Testimony

Petitioner alleges his federal constitutional right to confrontation, pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004), was violated by the trial court's admission of testimony of the gang expert, Officer Zuniga.  Dkt. 1 at 7-13.  Specifically, Petitioner alleges that the admission of Officer Zuniga's opinion testimony violated his Sixth Amendment right to confrontation because it was based on testimonial hearsay.  *Id.* at 8-13.  Petitioner refers to the following three areas of Officer Zuniga's expert opinion testimony about: (1) establishing a pattern of criminal gang activity by Sureño gang members; (2) the primary activities of Sureño gang members; and (3) Petitioner's statements and membership in the Sureño gang.  *Id.* at 9-13.  According to Petitioner, Officer Zuniga's testimony about these topics was based on "police investigations and interviews conducted by others who did not testify."  *Id.* at 8.  Petitioner further contends that the

11

admission of the testimony was prejudicial as to count 3 (active participation in a criminal street gang) and the gang enhancements found true as to counts 1 and 2. *Id.* at 7.

Related to the aforementioned claim is Petitioner's IAC claim, in which he alleges that his trial counsel was ineffective for failing to object to Officer Zuniga's testimony. *Id.* at 23-27.

### 1. Confrontation Clause Claim

#### a. State Court Opinion

As mentioned above, the state appellate court assumed that the confrontation clause argument was not forfeited and addressed the claim on the merits. *Espinoza*, 2016 WL 7105924, *5. The court outlined the applicable federal law, including the relevant United States Supreme Court cases, *Crawford v. Washington*, 541 U.S. 36 (2004) and *Davis v. Washington*, 547 U.S. 813 (2006), (which this Court will elaborate upon below), and applicable state law, as follows:

> At the time this court filed the original opinion in this case, the California Supreme Court had not yet considered whether the confrontation clause prohibits a gang expert from relying on hearsay to establish whether a particular gang meets the definition of a criminal street gang and to provide evidence that a particular crime was committed for the benefit of a gang. However, in *People v. Gardeley* (1996) 14 Cal. 4th 605, 618-619 (*Gardeley*), the court had reasoned that, "[c]onsistent with [the] well-settled principles" concerning expert witness testimony, a detective "could testify as an expert witness and could reveal the information on which he had relied in forming his expert opinion, including hearsay." (*Id.* at p. 619.) *Gardeley* reasoned that gang experts can rely on inadmissible hearsay because such evidence is not offered as "'independent proof' of any fact." (*Ibid.*) In the original opinion in this case, this court found it was required to follow *Gardeley*'s holding that the "basis evidence" was not offered as "'independent proof' of any fact." (*Ibid.*) This court also found that most, if not all, of the "basis evidence" was "nontestimonial" under any of the definitions in the recent confrontation clause cases. (See *Crawford, supra*, 541 U.S. at p. 59 [declining to give a comprehensive definition of "testimonial" but stating that at a minimum, it includes prior testimony and police interrogations]; *Davis, supra*, 547 U.S. at p. 822 [statements are testimonial when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"]; *Dungo, supra*, 55 Cal. 4th at p. 619 [in addition to the "primary purpose" requirement, to be testimonial, a statement "must be made with some degree of formality or solemnity"].)
>
> In *Sanchez*, the California Supreme Court held that "case-specific statements" related by a gang expert constituted inadmissible hearsay and that some of the statements constituted "testimonial" hearsay under the Sixth Amendment. (*Sanchez, supra*, 63 Cal. 4th at pp. 670-671.) The California Supreme Court disapproved its prior opinion in

12

*Gardeley*, supra, 14 Cal. 4th 605, "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez*, *supra*, at p. 686, fn. 13.)

*Id.* at *6-7. The state appellate court then rejected the claim on the merits as follows:

In the supplemental briefing submitted after *Sanchez*, defendant contends Officer Zuniga related both "ordinary and testimonial hearsay" regarding defendant's gang membership, defendant's intent to benefit the gang, and the offenses introduced to show a "pattern of criminal gang activity" (§ 186.22, subds. (a), (e).).

In addressing defendant's claims, we first note that Officer Zuniga was never asked to specify the basis of his knowledge for any specific facts. We are hesitant to presume, as defendant does, that Officer Zuniga's testimony related case-specific hearsay or testimonial hearsay. In the absence of a timely and specific objection to a particular statement on hearsay or confrontation grounds, which places the burden on the government to establish the admissibility of the statement (see *Idaho v. Wright* (1990) 497 U.S. 805, 816), reviewing courts should not presume that the witness is relating hearsay or that an out-of-court statement given to a law enforcement officer under unclear circumstances, possibly without testimonial purpose, is testimonial. (See *Denham v. Superior Court* (1970) 2 Cal. 3d 557, 564 [error must be affirmatively shown].)

We further note that according to Officer Zuniga, much of the information he based his opinions on came from his work as a gang intelligence officer. His testimony was largely based on contacts with gang members, confidential reliable informants, and other gang experts. Nothing in the record suggests, let alone establishes, that this information was "gathered during an official investigation of a completed crime" (*Sanchez*, *supra*, 63 Cal. 4th at p. 694), that the information was given in a way that bore any degree of solemnity or formality (see *Williams*, supra, 567 U.S. at p. ___ [132 S. Ct. at p. 2260] (conc. opn. of Thomas, J.); *Dungo*, *supra*, 55 Cal. 4th at p. 619) or that the information was provided through any kind of formal interrogation. (See *Davis*, *supra*, 547 U.S. at p. 822.) Additionally, nothing in the record indicates that the primary purpose of Officer Zuniga's information-gathering was to target defendant or any other individuals, to investigate a particular crime, or to establish past facts for a later specific criminal prosecution. (*See ibid.*)

We turn to the specifics of Officer Zuniga's testimony, beginning with the testimony used to establish a pattern of criminal gang activity by Sureño gang members. In the original opinion, this court noted that to the extent Officer Zuniga relied on the court records showing other Sureño gang members' criminal convictions, those court records did not constitute testimonial evidence as described in Crawford. (*See Crawford*, *supra*, 541 U.S. 36, at pp. 51-52, 68.) They were admissible as official records (see Evid. Code, § 1280) and hence reliance on them did not give rise to a confrontation clause violation. (*See id.* at p. 56; *People v. Taulton* (2005) 129 Cal. App. 4th 1218, 1225 [records that are "prepared to document acts and events relating to convictions and imprisonments" are beyond the scope of *Crawford*].) Defendant does not argue otherwise in the

supplemental briefing filed after *Sanchez*.

In his original briefing, defendant's primary argument was that in testifying about the crimes establishing the requisite "pattern of criminal gang activity" (§ 186.22, subds. (a), (e), (f)), Officer Zuniga improperly relied on statements in police reports, which were presumably taken during police investigations for the primary purpose of establishing or proving "past events potentially relevant to later criminal prosecution." (*Davis*, *supra*, 547 U.S. at p. 822.) Defendant reiterates this argument in the supplemental briefing filed after *Sanchez*. However, details about the crimes that were committed by other Sureño gang members were unnecessary to prove the gang crime or the gang enhancement. For purposes of section 186.22, the predicate offenses required to establish a "'pattern of criminal gang activity'" need not be "'gang related.'" (*Gardeley*, *supra*, 14 Cal. 4th at p. 621.) Rather, the "'pattern'" is established by evidence that members of the gang "individually or collectively have actually engaged in 'two or more' acts of specified criminal conduct committed either on separate occasions or by two or more persons." (*Id*. at p. 623.) The criminal conduct was proved by the court records from the cases of the individuals convicted of homicide, robbery, attempted murder and malicious shooting, and carrying a loaded firearm in a vehicle. The record does not show that Officer Zuniga related any hearsay or testimonial hearsay to the jury when rendering his opinions that the individuals involved in those crimes were Sureño gang members. Officer Zuniga was not asked about the specific facts on which he based those opinions, and he was entitled to rely on hearsay in rendering an opinion that a particular individual belonged to a gang. (See *Sanchez*, *supra*, 63 Cal. 4th at p. 677.) Although Officer Zuniga noted that he had reviewed crime reports and field interview cards in preparation for testifying about the various people involved in this case, he also specified that as a gang intelligence officer, he had daily informal contact with gang members, through which he learned about their gang affiilations [sic]. Moreover, the jury was entitled to consider the coparticipants' convictions stemming from the present offenses (i.e., the convictions of Montoya, Nunez, and Gayoso) when determining whether members of the Sureño gang had committed two or more predicate offenses. (See *People v. Loeun* (1997) 17 Cal. 4th 1, 5 ["the requisite 'pattern' can also be established by evidence of the offense with which the defendant is charged and proof of another offense committed on the same occasion by a fellow gang member"].) Thus, any error in admitting Officer Zuniga's testimony about the details of the predicate offenses was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

We next address Officer Zuniga's testimony that the primary activities of the Sureño gang are "a variety of crimes," including homicides, shootings, carjackings, robberies, and burglaries. This testimony was clearly based on Officer Zuniga's gang training and experience, and did not relate any "case-specific hearsay content" to the jury. (*Sanchez*, *supra*, 63 Cal. 4th at p. 670.) Again, defendant does not argue otherwise in the supplemental briefing filed after *Sanchez*.

Finally, we address whether Officer Zuniga's testimony about

14

defendant's prior police contacts and statements regarding his membership in the Sureño gang improperly related testimonial hearsay. In the supplemental briefing filed after *Sanchez*, defendant contends that "[m]ost of the evidence that [he] belonged to a gang" was based on testimonial hearsay. Defendant specifically identifies evidence of defendant's prior police contacts as the testimony that was improperly admitted. At trial, prior to testifying about those incidents, Officer Zuniga stated he had "reviewed" defendant's prior police contacts, indicating that his testimony "relate[d] hearsay information gathered during an official investigation of a completed crime." (*Sanchez*, *supra*, 63 Cal. 4th at p. 694.) This challenged testimony was introduced to show that defendant was actively participating in a criminal street gang (§ 186.22, subd. (a)) and that he committed the murder and attempted murder "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" (*id.*, subd. (b)(1)).

Assuming that under *Sanchez*, it was improper to admit Officer Zuniga's testimony about defendant's prior police contacts and statements regarding his membership in the Sureño gang, the error was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.) Officer Zuniga's challenged testimony was insignificant in comparison to the testimony of defendant's coparticipants, which established that defendant was an associate of the Vagos, a Sureño gang; that defendant had a tattoo of the number 22, meaning he had done a shooting; that defendant had a tattoo referring to a street in Vagos territory; that defendant had been involved in a gang discussion about how to respond to the shooting of a Sureño gang member; that defendant said he wanted to go find someone to shoot at; and that defendant committed the shootings along with his fellow Sureño gang members. (See *Yates v. Evatt* (1991) 500 U.S. 391, 403 [under *Chapman*, "an error did not contribute to the verdict" if that error was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record"], disapproved on another point in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.) Poncho, the surviving victim, also provided evidence of defendant's association with Sureño gang members. In light of the evidence presented through defendant's coparticipants and Poncho, no reasonable jury would have failed to convict defendant of the substantive gang offense or found the gang allegations untrue if Officer Zuniga's challenged testimony had been excluded. The testimony of the coparticipants and Poncho constituted significant additional evidence that distinguishes this case from *Sanchez*, in which the admission of testimonial hearsay was prejudicial error because "[t]he main evidence of [the] defendant's intent to benefit [his gang] was [the expert's] recitation of testimonial hearsay." (*Sanchez*, supra, 63 Cal. 4th at p. 699.)

*Espinoza*, 2016 WL 7105924, *7-8 (footnote omitted).

### b. Applicable Federal Law

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI.

15

The federal confrontation right applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." *See Crawford v. Washington*, 541 U.S. 36, 51 (2004). "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* (internal quotation and citation omitted); *see id.* ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. *Id.* at 50-51.

Out-of-court statements by witnesses that are testimonial hearsay are barred under the Confrontation Clause unless (1) the witnesses are unavailable, and (2) the defendants had a prior opportunity to cross-examine the witnesses. *Id.* at 59. The reliability of such statements, for Confrontation Clause purposes, depends solely upon these two factors. *Id.* at 68. Thus, the Court's prior holding in *Ohio v. Roberts*, 448 U.S. 56 (1980), that such statements may be admitted so long as the witness is unavailable and the statements have adequate "indicia of reliability," i.e., fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness," is overruled by *Crawford*. *See id.* Hearsay that is not testimonial, "while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford*, 541 U.S. at 61. An expert may render an opinion and explain the facts on which that opinion is based without violating the Confrontation Clause. *Williams v. Illinois*, 567 U.S. 50, 58 (2012) ("When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause."); *Hill v. Virga*,

588 Fed. App'x 723, 724 (9th Cir. 2014) (Supreme Court has not clearly established that admission of hearsay statements relied on by expert violates Confrontation Clause). Moreover, when expert testimony relies on out-of-court statements by others that *Crawford* would bar if offered directly, "'[t]he question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem.'" *United States v. Gomez*, 725 F.3d 1121, 1129-30 (9th Cir. 2013) (quoting *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009)).

Claims relating to the Confrontation Clause are subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004) (post-*Crawford* case); *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht*).

### c.       Analysis

As further explained below, the Court finds that Petitioner has failed to show that the state appellate court's rejection of Petitioner's confrontation clause claim was an unreasonable application of Supreme Court authority.

As mentioned above, Petitioner claims that Officer Zuniga relied upon "testimonial hearsay" to establish: (1) the gang's pattern of criminal activity/predicate offenses; (2) the gang's primary activities; and (3) Petitioner's gang membership. Dkt. 1 at 10-11. Specifically, Petitioner's contends that Officer Zuniga's testimony (relating to the aforementioned three areas) was inadmissible because he based it on police records and "field interviews with suspected gang members," some of which he did not personally conduct. *Id.* at 10-13. The state appellate court noted Officer Zuniga did not specify the basis of his expert testimony. *Espinoza*, 2016 WL 7105924, *7. However, the state appellate court also noted that Officer Zuniga stated that his opinions relied upon his work experience and informal connections. *Id.* at *7. *See also, e.g.,* 12 RT 1410-1411. Moreover, the state appellate court did not presume Officer Zuniga's testimony

related case-specific facts or testimonial hearsay, reasoning that "reviewing courts should not presume the witness is relating hearsay." *Id.* at \*8 (citing *Denham v. Superior Court*, 2 Cal. 3d 557, 564 (1970)). However, even if Officer Zuniga *did* rely on hearsay testimony, no clearly established Supreme Court authority exists to show that the admission of hearsay statements relied on by an expert violates the Confrontation Clause. *See Williams*, 567 U.S. at 57-58; *Hill*, 588 Fed. App'x at 724. Moreover, as stated above, the Supreme Court held in *Williams* that an expert may render an opinion and explain the facts on which that opinion is based without violating the Confrontation Clause. *Williams*, 567 U.S. at 58. The state appellate court was also reasonable in determining that even if Office Zuniga's testimony was inadmissible, the error was harmless as to each of the three areas outlined above, as follows. *See Espinoza*, 2016 WL 7105924, \*8.

### i. Gang's Pattern of Criminal Activity

First, the state appellate court determined that the official court records were sufficient to establish a "pattern of gang activity" because a "pattern" is shown when members of a gang independently or collectively commit at least two specific crimes either on separate occasions or with two or more persons. *Id.* (citing *People v. Gardeley*, 14 Cal. 4th 605, 623 (1996)). Moreover, the state appellate court correctly determined that the court records "were admissible as official records . . . and hence reliance on them did not give rise to a confrontation clause violation." *Id.* at \*7 (citing *Crawford*, 541 U.S. at 51-52, 68). Petitioner does not contest that these court records were testimonial in nature. *See* Dkt. 20-1 at 3-5. Rather, as mentioned, Petitioner contends that Officer Zuniga impermissibly relied on "testimonial hearsay" in the form of police records. *Id.* The state appellate court reasonably determined that Officer Zuniga did not relate testimonial hearsay, because he was allowed to consider hearsay in providing an opinion as an expert witness. *Espinoza*, 2016 WL 7105924, \*8. The record shows that Officer Zuniga appropriately related to the police record because he testified on cases that predated Petitioner's case and did not involve Petitioner nor the coparticipants to the present matter. 11 RT 1305-1311. Moreover, the state appellate court reasonably found that even if Officer Zuniga's reliance on the police record was in error, the error was harmless given that the jury could consider the coparticipants' convictions, Officer Zuniga's experience with gangs, and the record to arrive at the

18

same conclusion. *Espinoza*, 2016 WL 7105924, *8.

### ii. Gang's Primary Activities

Second, the state appellate court reasonably determined that Officer Zuniga's testimony on the Sureño's "primary activities" was admissible because it was "clearly based on [his] gang training and experience." *See id.* Petitioner solely contends that Officer Zuniga's statement could only be based on the police record. Dkt. 20-1 at 5. However, as the state appellate court also reasonably determined, Officer Zuniga's "gang training and experience" have established a general knowledge and expertise of the Sureño and Norteño gangs, which cannot be barred on hearsay grounds. *Espinoza*, 2016 WL 7105924, *8 (citing *Sanchez,* 63 Cal. 4th at 670); *see also id.* at 675 ("[E]xperts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc."). Petitioner does not contend nor provide evidence contesting Officer Zuniga's expertise. *See* Dkt. 20-1 at 4-5. The state appellate court determined that even if Officer Zuniga's testimony was improperly admitted, Petitioner's claim would still fail on the merits because Officer Zuniga's testimony on the gang's primary activities based on police records did not have an actual, prejudicial effect upon the jury. *See Hernandez*, 282 F.3d at 1144 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). As the state appellate court reasonably concluded, the testimonies of Sureño gang members were sufficient such that inclusion of Officer Zuniga's testimony would not have impacted the jury's verdict. *Espinoza*, 2016 WL 7105924, *8. Moreover, the state appellate court determined that the present case could be distinguished from *Sanchez*. *Id.* As the state appellate court noted, Officer Zuniga's testimony supplemented the coparticipants' testimonies in the present matter, whereas in *Sanchez*, the expert witness's testimonial hearsay was the primary evidence of the defendant's gang involvement. *Id.* (citing *Sanchez*, 63 Cal. 4th at 699). Co-participant Julio Montoya testified that as a member of the gang, he has assisted Sureño members in shootings, resulting in attempts to commit homicide or assault with a deadly weapon, thereby establishing a "pattern of criminal gang activity." 9 RT 917-918; *see* Cal. Penal Code Ann. § 186.22 ("'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for,

19

or conviction of two or more of the following offenses").  Coparticipant Juan Nunez testified that crimes such as retaliatory shootings and homicides were expected of Sureño gang members, establishing "primary activities" of the Sureño gang. 11 RT 1070-1072, 1080.  Finally, coparticipant Montoya testified that Petitioner had stated he was "involved" and "doing a lot of things" for the Sureño gang, that Petitioner was a member of Vagos, a Sureño gang.  9 RT 892; 11 RT 1054.

### iii.    Petitioner's Gang Membership

Third, Petitioner claims that Officer Zuniga's testimony about Petitioner's police contacts and statements about his membership in the Sureño gang improperly related testimonial hearsay.  Dkt. 1 at 12-13.  The state appellate court noted that this challenged testimony was introduced to show that Petitioner was actively participating in a criminal street gang and that he committed the murder and attempted murder "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." *Espinoza*, 2016 WL 7105924, *8.  The state appellate court assumed that even if it was improper to admit such testimony about Petitioner's prior police contacts and statements regarding his membership in the Sureño gang, the error was harmless beyond a reasonable doubt.  *Id.* (citing *Chapman*, 386 U.S. at 24).  The court determined that the challenged testimony

> was insignificant in comparison to the testimony of [Petitioner]'s coparticipants, which established that [Petitioner] was an associate of the Vagos, a Sureño gang; that [Petitioner] had a tattoo of the number 22, meaning he had done a shooting; that [Petitioner] had a tattoo referring to a street in Vagos territory; that [Petitioner] had been involved in a gang discussion about how to respond to the shooting of a Sureño gang member; that [Petitioner] said he wanted to go find someone to shoot at; and that [Petitioner] committed the shootings along with his fellow Sureño gang members.

*Id.*; *see, e.g.*, 9 RT 892; 9 RT 897-897; 9 RT 930; 11 RT 1081-1082.  Moreover, Poncho, the surviving victim, also provided evidence of Petitioner's association with Sureño gang members.  *Espinoza,* 2016 WL 7105924, *8.  The state appellate court was reasonable to conclude that, in light of the evidence presented through Petitioner's coparticipants and Poncho, no reasonable jury would have failed to convict Petitioner of the substantive gang offense or found the gang

allegations untrue if Officer Zuniga's challenged testimony had been excluded. *See id.*

### iv.    Summary

Based on the above, the Court finds that the state appellate court's rejection of Petitioner's confrontation clause claim stemming from the improper admission of "testimonial hearsay" was based on a reasonable application of clearly-established federal law under section 2254(d)(1). Accordingly, this claim is DENIED.

### 2.    IAC Claim

Because Petitioner's confrontation clause claim relating to the aforementioned inadmissible testimonial hearsay fails, the state court's summary denial of any related IAC claim based on trial counsel's failure to object to such testimony was therefore neither contrary to nor an unreasonable application of federal law. Furthermore, Petitioner has made no showing that the state appellate court's summary denial of his IAC claim was either contrary to or an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). *See id.* at 687 (under *Strickland*, a defendant must show that (1) performance was deficient and that (2) the "deficient performance prejudiced the defense."). Accordingly, Petitioner's IAC claim is DENIED.

## B.    Juror Misconduct

Petitioner alleges that the state court erred in finding no prejudice from juror misconduct, thereby violating his federal constitutional rights. Dkt. 1 at 14-22.

### 1.    State Court Opinion

The state appellate court described the factual background on this claim and rejected it as follows:

> During the initial jury deliberations, a juror visited the scene of the Perez shooting and told the other jurors that it would have been difficult to make an identification from Gastelum's location. The trial court held a hearing and determined that the juror had committed misconduct, but that there was no prejudice. The trial court replaced the juror with an alternate and instructed the jury to begin deliberations anew and disregard anything that the juror had said. The trial court denied defendant's motion for a mistrial and his later motion for a new trial.
>
> Defendant contends that the trial court erred by finding that the jury misconduct was not prejudicial.

**1. Proceedings Below**

The jury began deliberating on the afternoon of Friday, April 13, 2012. The jurors retired to deliberate at 3:06 p.m. and were excused at 4:45 p.m.

On Monday, April 16, 2012, the jury resumed deliberations at 9:00 a.m. At 9:15 a.m., the jury sent the trial court a note stating, "[Juror No. 55] went to the location of [the] shooting on Thurs. evening before the beginning of deliberations. No one was swayed by his statement."

The trial court indicated it believed that Juror No. 55 had committed misconduct and proposed that Juror No. 55 be removed. Defendant agreed there had been juror misconduct and requested a mistrial. The prosecutor advocated for a hearing to determine whether the misconduct was prejudicial.

The trial court called in Juror No. 55, who admitted he had gone to the scene of the shooting, out of "curiosity." He told the other jurors that he "went over there," and he said "that it was difficult to see what was happening when you're too far from there, from the street." Juror No. 55 had gone to the scene the prior Thursday, and he told the other jurors about his visit the next day. None of the other jurors said anything in response to his comment: "They just listened."

The trial court then called in the jury foreperson. The trial court asked if the other jurors had discussed Juror No. 55's comment. The foreperson indicated that some of the jurors had expressed "shock that he had done it" because of the trial court's admonition not to go to the scene. The foreperson continued, "But nobody—basically the point he brought up everybody had already decided on that point. Do I say what that point is or—" The trial court responded, "I don't think you need to."

The trial court asked, "Did the comment made by Juror Number 55 result in a conversation that would—that [was] a part of your deliberations?" The foreperson responded, "No. Not really, no." The foreperson said that the jury had only discussed whether or not to report the incident to the court.

The trial court asked the foreperson to describe Juror No. 55's comment. The foreperson stated, "That he went to the location. Took a look from the point of view of Mr. G and said he didn't think that Mr. G could see that far to be able to identify a face." Juror No. 55 continued, "But everybody else had already made that decision, that we agreed that we did not believe that—" The trial court interrupted, saying, "I don't want to invade the province of the jury at this point."

Defendant reiterated his request for a mistrial. The trial court denied the request and decided, instead, to dismiss Juror No. 55, admonish the remaining jurors, and bring in an alternate juror. The trial court explained the basis for its ruling: "The jurors did deliberate for over an hour on Friday . . . . And it appears to the Court that Juror Number 55 on Friday revealed that he had been to the scene of the event. And he quickly was told by the rest of the jurors that that was not an okay

thing to do . . . . It does not appear that there were any discussions other than that was not an okay thing to do that were held between the other jurors regarding the comments that Juror [No.] 55 made."

After dismissing Juror No. 55, the trial court admonished the remaining jurors as follows: "It is the Court's understanding that the—there may have been a comment by a juror on information that he received from outside of the trial. So as trial jurors, the important thing for you to do is only deliberate and only consider the evidence that was received at trial. Anything that is received outside of the courtroom or seen or viewed or told to you outside of the courtroom is not to be considered at trial. And I will tell you specifically if you heard any comments made by Juror [No.] 55 regarding anything that he said or any information that he received either by viewing himself or heard from someone else outside of the trial is not to be considered by you." The trial court told the jurors that anything they heard from Juror No. 55 should be treated as "evidence that's stricken during the trial" and "should not be considered by you for any purpose."

The trial court suspended deliberations until the alternate juror could be brought in. When the alternate joined the jury, the trial court instructed the jurors that "the jury deliberation process begins anew." The jury reached its verdicts later that day.

Defendant subsequently brought a motion for a new trial based on the jury misconduct. The trial court denied the motion on June 21, 2012, finding that there was no prejudice.

## 2. Analysis

Due process requires a jury be "'capable and willing to decide the case solely on the evidence before it . . . .' [Citations.]" (*People v. Nesler* (1997) 16 Cal. 4th 561, 578 (*Nesler*), italics omitted.) Thus, "[j]uror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias." (*Ibid.;* see also *In re Hitchings* (1993) 6 Cal. 4th 97, 119 (*Hitchings*).)

"When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant." (*Nesler, supra,* 16 Cal. 4th at pp. 578-579.)

The presumption of prejudice arising from juror misconduct "'may be rebutted by proof that no prejudice actually resulted.' [Citations.]" (*Hitchings, supra,* 6 Cal. 4th at p. 118.) More specifically, the presumption of prejudice "'may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a reasonable probability of actual harm to the complaining party [resulting from the misconduct] . . . .' [Citations.]" (*Id.* at p. 119.) On appeal, whether prejudice arose from juror misconduct "is a mixed question of law and fact subject to an appellate court's independent determination. [Citations]." (*Nesler, supra,* 16 Cal. 4th at p. 582.)

In this case, defendant contends the jury misconduct was "so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror." (*Nesler, supra,* 16 Cal. 4th at pp. 578-579.) The test for inherent bias "is analogous to the general standard for harmless error analysis under California law. Under this standard, a finding of 'inherently' likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. Application of this 'inherent prejudice' test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information." (*In re Carpenter* (1995) 9 Cal. 4th 634, 653(*Carpenter*).)

We disagree that the information conveyed by Juror No. 55 was "so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror." (*Nesler, supra,* 16 Cal. 4th at pp. 578-579.) Although the accuracy of Gastelum's identification was an important issue at trial, Juror No. 55's misconduct did not "completely undermine[ ]" the defense case, as defendant claims. The evidence had already established that Gastelum had viewed the scene from a distance of at least 300 feet and that his view was obscured when defendant shot at Perez from close range. The evidence had also established that someone could have confused defendant and Nunez from such a distance, due to their similarities in size, build, and hairstyle. Additionally, pictures of the scene and Gastelum's location were introduced into evidence, so the jurors were able to assess the distance for themselves. (See *People v. Sutter* (1982) 134 Cal. App. 3d 806, 821[juror's description of her visit to the scene could not "possibly have added anything to what the jurors already knew" because of pictures introduced into evidence].) Thus, although Juror No. 55 committed misconduct, he did not introduce any evidence into the jurors' deliberations that was "so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment." (*Carpenter, supra,* 9 Cal. 4th at p. 653.)

Next, we consider whether it is "substantially likely a juror was 'actually biased' against the defendant." (*Nesler, supra,* 16 Cal. 4th at pp. 578-579; see also *Carpenter, supra,* 9 Cal. 4th at p. 654.) Under this test, "'[t]he presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, *upon examining the entire record,* that there is no substantial likelihood that the complaining party suffered actual harm.' [Citation.]" (*Carpenter, supra,* 9 Cal. 4th at p. 654.) "In an extraneous-information case, the 'entire record' logically bearing on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant." (*Ibid.*)

Courts have often found that the presumption of prejudice arising

from juror misconduct was rebutted because the trial court was apprised of the misconduct during deliberations and was able to implement "curative measures such as the replacement of the tainted juror with an alternate or a limiting instruction or admonition." (*People v. Holloway* (1990) 50 Cal. 3d 1098, 1111, disapproved on other grounds by *People v. Stansbury* (1995) 9 Cal. 4th 824, 830, fn. 1; see also *People v. Dorsey* (1995) 34 Cal. App. 4th 694, 704 [presumption of prejudice rebutted where trial court replaced the offending juror and instructed the jury to begin deliberations anew].) For instance, in *People v. Knights* (1985) 166 Cal. App. 3d 46 (*Knights*), during deliberations, a juror learned that the defendant had previously killed a four-year-old child, and she told the rest of the jury what she had heard. The presumption of prejudice was rebutted, however, because "the misconduct occurred early in the deliberations" and was quickly brought to the court's attention by the foreperson. (*Id.* at p. 51.) "The potentially biased juror was excused and replaced with an alternate juror," and the remaining jurors "were instructed to begin deliberations again as if no deliberations had ever occurred." (*Ibid.*)

On this record, we find that the presumption of prejudice arising from Juror No. 55's misconduct was rebutted. Considering the nature of the jury misconduct and the fact that the extraneous material was not inconsistent with other evidence at trial, there was "'no substantial likelihood'" that defendant "'suffered actual harm'" from the jury misconduct. (*Carpenter, supra,* 9 Cal. 4th at p. 654.) Further, in this case, similar to *Knights,* "the misconduct occurred early in the deliberations" and was quickly brought to the court's attention by the foreperson. (*Knights, supra,* 166 Cal. App. 3d at p. 51.) "The potentially biased juror was excused and replaced with an alternate juror." (*Ibid.*) The remaining jurors were instructed not to consider anything Juror No. 55 said, and they "were instructed to begin deliberations again as if no deliberations had ever occurred." (*Ibid.*) Under the circumstances, it is not "substantially likely a juror was 'actually biased' against the defendant." (*Nesler, supra,* 16 Cal. 4th at p. 579.)

*Espinoza*, 2016 WL 7105924, *9-12 (footnotes omitted).

## 2.    Applicable Federal Law

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a trial by a fair and impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The right to a jury trial is extended to state criminal trials through the Due Process Clause of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 148–149 (1968) (holding that "the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee.").

The Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Due process

25

requires a jury capable and willing to deliberate solely based upon the evidence presented, and a trial judge watchful to prevent prejudicial occurrences and to assess their effects if they happen. *Id*. A decision on whether an allegedly compromising situation requires further investigation is a matter of court and trial management usually left to the sound discretion of the trial court under state law. *People v. Williams*, 58 Cal. 4th 197, 290 (2013).

### 3. Analysis

As noted above, where the state court's factual findings are at issue in a habeas proceeding, the district court must first conduct an "intrinsic review" of its fact-finding process. *See Taylor*, 366 F.3d at 999-1000. "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam) (it is not the province of the district court on federal habeas review to reassess issues of credibility or to reweigh the evidence).

Here, the trial court conducted a hearing on Juror Number 55's alleged misconduct, which included the presentation of testimony by Juror Number 55 and the jury foreperson. 15 RT 1845-1856. The trial court found that the misconduct was not prejudicial. 15 RT 1858-1859. The state appellate court affirmed the trial court's ruling in a reasoned decision. *Espinoza*, 2016 WL 71905924, *11. In evaluating Petitioner's juror misconduct claim, the state appellate court determined that Juror Number 55's information was not so prejudicial that erroneous introduction would warrant reversal of judgment. *Id.* Here, the trial court acted immediately and informed the parties of the reports of juror misconduct, stating:

> "[The jurors] did gather at 9 o'clock, and the Court received a comment at 9:15 indicating that one of the jurors went to the location of shooting on Thursday evening before the beginning of deliberations. And no one was swayed by his statement. The Court has inquired and has found out that it's . . . juror number 55. I've provided information to both counsel just currently on the record about which juror it was but previously provided to counsel access to the written statement of the jurors . . . [I]t does appear to the Court [what has happened] to be misconduct and that [juror number 55] would be removed."

15 RT 1840-1841. The trial court added that it intended to bring Juror Number 55 in to determine what information he had provided to the jurors and to question the other jurors as well. 15 RT 1841. Petitioner's counsel requested a mistrial, which the trial court denied pending Juror Number 55 and the foreperson's responses and its intention to seat an alternate juror. 15 RT 1841. After questioning the foreperson, the trial court found that the other jurors had not discussed or considered the comments made by Juror Number 55. 15 RT 1854-1855. Based on this assurance, the trial court dismissed Juror Number 55, admonished the jury to disregard the extrinsic evidence, and brought in an alternate juror. 15 RT 1860-1862. The trial court's factual finding that the jury had not discussed the comments raised by Juror Number 55 is presumed to be correct unless rebutted by Petitioner. 28 U.S.C. § 2254(e)(1). As stated, the remaining jurors were admonished not to consider Juror Number 55's comments and to start jury deliberations anew. 15 RT 1861-1862.

Thus, the record demonstrates that Petitioner had a full, fair and complete opportunity to present evidence in support of his claim to the state courts. Therefore, the Court finds that the state court's fact-finding process that the jury had not discussed the comments raised by Juror Number 55 survives intrinsic review. *See Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (noting that "a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable") (quoting *Taylor*, 366 F.3d at 999).

"Once the state court's fact-finding process survives this intrinsic review . . . the state court's findings are dressed in a presumption of correctness. . . ." *Taylor*, 366 F.3d at 1000. "AEDPA spells out what this presumption means: State-court fact-finding may be overturned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state-court finding is in error." *Id.* (citing 28 U.S.C. § 2254(e)(1)). In the instant matter, the state appellate court ruled that the denial prejudice in Juror Number 55's misconduct was based on the trial court's reasonable factual finding and legal conclusion that the Juror Number 55's misconduct occurred after the jury had already decided on that issue, and the misconduct would not have created the likelihood of a different

result on retrial. On federal habeas review, that finding is entitled to deference under section 2254(d)(2). Petitioner fails to present clear and convincing evidence sufficient to overcome the presumption of correctness of the state court's factual findings.

However, the salient question under section 2254(d)(2) is whether the state appellate court, applying the normal standards of appellate review, could reasonably conclude that the trial court's findings are supported by the record. *See Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).

Here, as explained above, Petitioner claims the trial court erred in determining that Juror Number 55's misconduct did not cause prejudice, and that the state appellate court erred in affirming the trial court's findings. Dkt. 1 at 14. The trial court determined Juror Number 55's visitation of the shooting location and his comments on the location's visibility was not prejudicial. 15 RT 1859. The state appellate court then reasonably determined that there was no substantial likelihood that Petitioner suffered actual harm from the jury misconduct because the "extraneous material" was not inconsistent with other evidence at trial. *Espinoza*, 2016 WL 71905924, *11-12. The Ninth Circuit has set forth five factors for considering if extrinsic evidence is prejudicial:

> (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the extrinsic material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of . . . whether the introduction of extrinsic material affected the verdict.

*Mancuso v. Olivarez*, 292 F.3d 939, 951-52 (9th Cir. 2002) (quoting *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986)), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000). In *Mancuso*, the Ninth Circuit explained that there is no "bright line test" to determine prejudice from juror exposure to extraneous information, and a court "place[s] great weight on the nature of the extraneous information that has been introduced into deliberations." *See Mancuso*, 292 F.3d at 950. But a court should not consider the number of jurors affected by extrinsic evidence because even a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict. *Lawson v. Borg*, 60 F.3d 608, 613 (9th Cir. 1995).

Beginning with the first three *Mancuso* factors, the record shows that only Juror Number

28

55 went to the site of the shooting, but his comment that, "to [him] it was very difficult to see something from where [he] was standing" was made to the other members of the jury. 15 RT 1850. The comment was made on Friday, April 13, 2012, and the foreperson reported the misconduct on Monday, April 16, 2012, adding that "[n]o one was swayed by [Juror Number 55's] statement." 15 RT 1840. The foreperson reported that Juror Number 55's introduction of extrinsic material did not impact or change the jury's mindset because the jury "had already decided on that point." 15 RT 1853. Moreover, the comment in the present case did not introduce new evidence because photos of the scene and the witness's location were already given to the jury as evidence during trial. 12 RT 1509-1523.

As to the fourth *Mancuso* factor, the extrinsic material was introduced before the verdict was reached, at the beginning of deliberation. 15 RT 1853. However, the trial court noted that the foreperson stated that by that point "everybody had already decided on that point." *Id.*; *see Bayramoglu*, 806 F.2d at 888 (observing that, though not determinative, a juror's assurance that he could disregard the extraneous information was "certainly significant"). Finally, as to the fifth *Mancuso* factor, considering the witness statements and details of the scene submitted to the jury in addition to the foreperson's assurances, Juror Number 55's comment could not have been an influential factor in the jury's decision to find Petitioner guilty.

In sum, the record shows that, although Juror Number 55 inappropriately introduced extrinsic material during deliberations, the trial court found that such extrinsic material did not have a prejudicial effect on the verdict. The state court's decision was not "objectively unreasonable in light" of the evidence presented, and Petitioner has failed to rebut this presumption of the state court's correctness by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Furthermore, as the state appellate court concluded, the jury could have arrived at the same conclusion given the evidence presented at trial. *Espinoza*, 2016 WL 7105924, *11. Thus, under these circumstances, the state appellate court reasonably found that the trial court's determination was supported by the record. *See id.*

Accordingly, the state courts' decisions denying Petitioner's challenge to the alleged juror misconduct were not contrary to, or an unreasonable application of, clearly established Supreme

Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1), (2). Therefore, Petitioner is not entitled to relief on his juror misconduct claim, and it is DENIED.

## IV. REQUEST FOR EVIDENTIARY HEARING

Petitioner has requested an evidentiary hearing on his claims. Dkt. 1 at 27. The Court concludes that no additional factual supplementation is necessary, and that an evidentiary hearing is unwarranted with respect to the claims raised in the instant petition.

For the reasons described above, the facts alleged in support of these claims, even if established at an evidentiary hearing, would not entitle Petitioner to federal habeas relief. Further, Petitioner has not identified any concrete and material factual conflict that would require the Court to hold an evidentiary hearing in order to resolve. *See Cullen v. Pinholster*, 563 U.S. 170 (2011). Therefore, Petitioner's request for an evidentiary hearing is DENIED.

## V. CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case. For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong. *See Slack*, 529 U.S. at 484. Petitioner may not appeal the denial of a certificate of appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## VI. CONCLUSION

For the reasons outlined above, the Court orders as follows:

1. The petition is DENIED, and a certificate of appealability will not issue. Petitioner's request for an evidentiary hearing is DENIED. Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2. The Clerk of the Court shall terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: July 24, 2018

YVONNE GONZALEZ ROGERS
United States District Judge

30